Filed 3/16/26  In re R.J. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re R.J., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B348642 (Super. Ct. No. J073529) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. B.-D.S., Defendant and Appellant. | |

        B.-D.S. (Mother) appeals from the juvenile court's order terminating her parental rights to her infant daughter, R.J., and selecting adoption as the permanent plan.  (Welf. & Inst. Code,[1]

_____

        [1] Further unspecified statutory references are to the Welfare and Institutions Code.

§ 366.26.)[2]  Mother contends the juvenile court erred in finding that the Indian Child Welfare Act (ICWA) did not apply.  She contends conditional reversal is required to allow further ICWA inquiry.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

In July 2024, R.J. tested positive for drugs at birth.  The Ventura County Human Services Agency (the Agency) filed a petition alleging R.J. suffered or there was substantial risk that she would suffer serious physical harm or illness due to Mother's substance abuse issues.  (§ 300, subd. (b).)

Before the detention hearing, Mother completed a Parental Notification of Indian Status (ICWA-020) form.  She checked a box stating "I am or may be a member of" a federally recognized Native American tribe.  She identified the "Cherokee" tribe and left the "location of the tribe" blank.  Mother told the social worker that R.J.'s deceased maternal great-grandfather, Marion P., "was Cherokee and may have been enrolled or eligible for enrollment."  Mother had no further information and stated that maternal grandmother had more information, but she was also deceased.

The social worker also interviewed maternal aunt, Amanda D., who reported that Marion P. was Cherokee.  She did not know if he was enrolled but said he had "tribal involvement."  She also reported that maternal grandmother tried to obtain membership but was not eligible for enrollment.  The social worker also interviewed maternal uncle, Josh D., who also said Marion P. was Cherokee but he did not know if he was enrolled in a tribe.  He said that Marion P. did not receive financial support from a tribe.  He also reported maternal grandmother was not enrolled.

_____

[2] Father is not a party to this appeal.

The jurisdiction and disposition report stated that a social worker interviewed maternal great uncle, Chuck P., who is the son of Marion P. and the father of M.W., who is Mother's cousin and the prospective adoptive mother. He reported that maternal great grandmother said that Marion P. was Cherokee but was not registered. He said that he was "positive that [Marion P.] was not registered because the family tried to check into it 'but nothing came up.' " He and other relatives also completed genetic testing, none of which provided any results for Native American ancestry. The social worker also called maternal great aunt, Sherlyn P.,[3] who reported that Marion P. and his wife Phyllis P. wanted to register with the Cherokee tribe so that they could receive dividends from the casinos. Sherlyn P. reported that around 2000–2001, Phyllis and Marion P., accompanied by maternal great aunt and uncle, went to North Carolina to "go through the books for the Cherokee Tribe and attempted to trace their lineage and register for the tribe." However, the trip was unsuccessful and they were unable to register with the Cherokee tribe.

A social worker also spoke to maternal cousin, J.W., who reported that there was a "rumor that the family had Cherokee lineage but after various relatives took ancestry tests, this was disproven." The social worker had a follow-up call with Amanda and Josh D. Amanda D. said that Marion P. passed away over 15 years prior, and she further explained that maternal grandmother tried to register herself and her children (Mother and maternal uncles) but was denied due to "not having enough of the Cherokee blood" to register. She further said that she did

---

[3] Maternal great aunt's name is alternatively spelled "Cherlynn" in the record.

not believe R.J. would be able to register since the other relatives were not able to do so.  Based on the new information, the Agency found there was "no evidence provided of eligibility for or actual membership or enrollment in a federally recognized Native American tribe," and it recommended the court find ICWA does not apply.

At the jurisdiction and disposition hearing, the juvenile court sustained the petition and ordered reunification services to Mother.

In the six-month status review report, the Agency noted that the social worker met with Sherlyn P., who reviewed the Indian Child Inquiry (ICWA-010) form and responded that the family's Native American ancestry was "just a lot of talk within the family but no, I don't believe so."  She denied any enrollment in a federally recognized Native American tribe or connection.  The social worker also asked mother's cousin, M.W., about the ICWA-010 form.  She replied, "[T]here were some talks but no connection."  She denied any enrollment in a federally recognized tribe or connection.  A social worker contacted Mother's father, who reviewed the ICWA-10 form and reported, "[N]o, not that I am aware of."  He denied any enrollment in a federally recognized tribe or connection.

At the six-month review hearing, the Agency recommended terminating Mother's reunification services because she had not progressed in her case plan and it was unlikely she would achieve and sustain sobriety to reunify with R.J.  The juvenile court terminated Mother's services and set a section 366.26 hearing.

Prior to the section 366.26 hearing, the juvenile court held a hearing in July 2025 and asked if anybody in the courtroom had information that R.J. may be a Native American child or eligible or enrolled into a federally recognized tribe.  Mother

4

stated that Marion P. was "full-blooded Cherokee" and that she believed he was a registered member, but did not know which Cherokee tribe. The court asked maternal grandfather if he had any information. He said he did not know "the exact tribe." Maternal grandfather also suggested that Marion P. was from the "midwest area" and believed he was from Ohio. When the court asked if there was anyone else who might have further information regarding Marion P.'s membership, Mother and maternal grandfather identified maternal great uncle and aunt, Chuck and Sherlyn P.

In its section 366.26 report, the Agency recommended Mother's parental rights be terminated and adoption be selected as the permanent plan. R.J. had been in the neonatal intensive care unit before being placed in different foster homes, and in May 2025, she was placed with M.W. and her husband J.W. in Virginia. R.J. had begun to establish a stable and nurturing attachment to her prospective adoptive parents. In a memorandum, the Agency further reported that a social worker contacted Sherlyn and Chuck P. with regard to possible Cherokee ancestry with Marion P. They responded that "their family does not have any Cherokee ancestry or any Native American ancestry." They also provided a "23 and Me" snapshot for Chuck P., who is the son of Marion P. The snapshot shows 0% Native American ancestry.

At the contested section 366.26 hearing, the juvenile court found there was "no reason to believe or know that [R.J.] is a Native American child" and that ICWA does not apply. The court terminated Mother's parental rights and selected adoption as the permanent plan.

DISCUSSION

Mother contends the Agency failed to comply with its inquiry duties under ICWA and that a conditional remand is necessary to allow a complete inquiry.  Mother does not contend the Agency overlooked any relatives in its inquiry, but she contends the Agency had the duty to further investigate and notify Cherokee tribes after Mother and some relatives mentioned possible Cherokee ancestry.  We are not persuaded.

The juvenile court and the Agency "have an affirmative and continuing duty to inquire whether a child [in a dependency proceeding] . . . is or may be an Indian child."  (§ 224.2, subd. (a).)  An "Indian child" is either (1) a member or citizen of an Indian tribe or (2) eligible for membership or citizenship and is a biological child of a member or citizen of an Indian tribe.  (§ 224.1, subd. (b)(1)(A) & (B).)  When a child is placed into the temporary custody of a county welfare department, the duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b)(2); Cal. Rules of Court,[4] rule 5.481(a)(1); *In re Dezi C.* (2024) 16 Cal.5th 1112, 1132 (*Dezi C.*).)

"When the agency has 'reason to believe' that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required.  (§ 224.2, subd. (e); see also rule 5.481(a)(4).)  The required further inquiry includes (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State

---

[4] All rule references are to the California Rules of Court.

6

Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe. (§ 224.2, subd. (e)(2)(A)–(C).) At this stage, contact with a tribe 'shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of [ICWA] notices,' and 'sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case.' (*Id.*, subd. (e)(2)(C).)." (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1132–1133, fn. omitted.)

" 'The duty to provide notice [to a child's tribe] arises only if [the agency] or the court "knows or has reason to know that an Indian child is involved." ' " (*In re K.H.* (2022) 84 Cal.App.5th 566, 598; § 224.3, subd. (a).)

The juvenile court may make a finding that ICWA does not apply if the county department's inquiry and due diligence were "proper and adequate" and there is no reason to know whether the child is an Indian child. (§ 224.2, subd. (i)(2); *Dezi C.*, *supra*, 16 Cal.5th at p. 1134.) The court's factual finding that ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).)

A juvenile court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review. [Citations.] ' "On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes." ' [Citations.]" (*Dezi C.*, *supra*, 16 Cal.5th

7

at p. 1141, citing *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101–1102 (*Kenneth D.*).) "If, upon review, a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law (rule 5.481(a)(5)), there is no error and conditional reversal would not be warranted." (*Dezi C.*, at p. 1141.)

Here, substantial evidence supports the juvenile court's findings that the Agency's inquiry and due diligence were proper and adequate and that ICWA did not apply because there was no reason to believe R.J. was an Indian child. The record of the Agency's inquiry, as we have summarized above, is "well-developed." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141; *Kenneth D.*, *supra*, 16 Cal.5th at p. 1101.) It reflects the Agency inquired diligently throughout the dependency proceedings regarding Mother's claim of potential Cherokee ancestry by interviewing family members, some of whom Mother herself identified as family members who would have further information regarding Marion P.'s Cherokee ancestry. When the Agency interviewed Chuck P., he was "positive that [Marion P.] was not registered because the family tried to check into it 'but nothing came up.' " Additionally, Sherlyn P. reported that Marion P. attempted to trace his lineage and register for the tribe, but the attempt was unsuccessful.

Other family members gave further indication that R.J. or Mother was not a member or eligible for membership in a Cherokee tribe. Maternal aunt and uncle Amanda and Josh D. reported that maternal grandmother tried to obtain membership for herself and her children, including Mother, but was denied. Amanda D. said that she did not believe R.J. would be able to register since the other relatives were not able to do so. J.W. and

8

M.W. also similarly reported that the Cherokee lineage was a "rumor" and that "there were some talks but no connection" to membership in a Cherokee tribe.  Together, this evidence supports the finding that there was no reason to believe R.J. was an Indian child and that ICWA does not apply.  For these reasons, Mother's reliance on *In re Claudia R.* (2025) 115 Cal.App.5th 76 is not persuasive.  There, the child welfare agency failed to ask "reasonably available" family members about the children's ancestry.  (*Id.* at p. 88.)  We conclude further inquiry to an unspecified Cherokee tribe was not warranted.  (§ 224.2, subd. (e)(2)(A)–(C).)

DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

YEGAN, Acting P. J.                    DEROIAN, J.[*]

---

[*] Judge of Santa Barbara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9

Gilbert A. Romero, Judge

Superior Court County of Ventura

_____

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Tiffany N. North, County Counsel, Joseph J. Randazzo, Assistant County Counsel, for Plaintiff and Respondent.